606 F.2d 499
 Jessie CODY, Sallie Mae Cody and all others similarly
situated, Plaintiffs- Appellees,
v.
COMMUNITY LOAN CORPORATION OF RICHMOND COUNTY, Defendant-Appellant.
James TOUCHSTONE, Glenda Touchstone, Inez Singleton and all
others similarly situated, Plaintiffs-Appellees,
v.
COMMUNITY LOAN & INVESTMENT CORPORATION OF AUGUSTA,
Defendant-Appellant.
 No. 76-1687.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 2, 1979.
Dissenting Opinion Oct. 26, 1979.
Rehearing and Rehearing En Banc Denied Dec. 11, 1979.
 
 W. Rhett Tanner, Richard M. Kirby, Atlanta, Ga., for defendant-appellant.
 T. J. Foss, Augusta, Ga., Ernest V. Harris, Athens, Ga., John L. Cromartie, Jr., Harry W. Pettigrew, Atlanta, Ga., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before BROWN, Chief Judge, THORNBERRY and MORGAN, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 These consolidated cases come before us in a different posture than the other cases[1] we have decided today involving the McCarran-Ferguson Act ("McCarran Act"), 15 U.S.C. §§ 1011 Et seq., and the Truth in Lending Act ("TIL"), 15 U.S.C. §§ 1601 Et seq. Here the district court rejected the McCarran Act defense, reached the merits of the TIL claims, and entered judgment for plaintiffs. We affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 Community Loan Corporation of Richmond County and Community Loan & Investment Corporation of Augusta (hereinafter "Community") are separately incorporated but share the same officers and board of directors. They are wholly-owned subsidiaries of Aristar, Inc., the parent corporation of a financial conglomerate that operates more than 400 loan offices in 26 states and owns the Diamond State Life Insurance Company and the Diamond State Agency. Community is a lender licensed under the Georgia Industrial Loan Act, Ga.Code Ann. §§ 25-301 Et seq.
 
 
 3
 In 1972 Aristar developed a program to offer cancer insurance for sale in the loan offices of its subsidiaries. This insurance was to be issued by American Family Life Assurance Company and was to be offered in addition to the credit life, accident and health, and property insurance customarily written in connection with loan transactions.[2] The annual premium $40 on an individual policy, $60 on a family policy was to be paid by Community to American Family out of the proceeds of the loan. Pursuant to a brokerage agreement between American and Diamond State Agency, for each cancer policy sold in the loan office, 50% Of the premium would be returned in the form of a sales commission to Diamond State Agency. Of that amount, $10 or $12 would be disbursed to the loan manager who sold the insurance policy and $2 or $5 to his district supervisor. Diamond State Agency also received a $2 application fee and a $2.40 credit toward the purchase of American Family stock for each cancer policy sold.
 
 
 4
 Despite some initial qualms about selling these "CancerCare" policies,[3] Aristar and Community decided to implement the sales program on an experimental basis in Georgia and South Carolina. The program was arranged by Diamond State Life Insurance Company and American Family, with Diamond State to oversee the licensing of Community's loan managers and to ensure compliance with state insurance regulations. Community's loan managers eventually became licensed insurance agents of American Family, and the Georgia sales program was instituted in January 1973. The South Carolina program never got off the ground, apparently because of licensing difficulties.
 
 
 5
 The program was temporarily halted in April 1973, apparently because of the sales techniques of some overzealous loan managers who added the price of the cancer policy to the loan without the borrower's knowledge or consent. Internal correspondence indicates attempts to correct this practice,[4] and the sales program was reinstated in July. However, it was terminated in early 1974.
 
 
 6
 Plaintiffs Jessie and Sallie Mae Cody, James and Glenda Touchstone, and Inez Singleton were Community customers who applied for loans in February and March 1973. While handling the loan applications, Community's loan managers, acting as agents of American Family, sold the plaintiffs CancerCare policies. Each plaintiff signed a loan contract and a separate application for cancer insurance, although the record strongly suggests that they did not know they were purchasing the cancer insurance. The first year's premium was deducted from the loan proceeds and was indicated as a disbursement to the customer and American Family. Community then issued checks payable to American Family and the customer, and the insurance applications and checks were forwarded to American Family for approval and issuance of the policies.
 
 
 7
 The plaintiffs brought suit on behalf of themselves and others similarly situated, alleging violations of TIL's credit sale disclosure requirements, 15 U.S.C. § 1638(a); 12 C.F.R. § 226.8(c).[5] They sought the statutory penalty and attorneys' fees allowed under 15 U.S.C. § 1640(a).[6] The district court certified the cases as class actions and, by stipulation of the parties, they were submitted as though they had been tried to the court without a jury. The court ultimately entered judgment for plaintiffs, and Community appealed.
 
 II. THE McCARRAN ACT
 
 8
 The district court concluded that the McCarran Act exemption[7] was unavailable to Community because Georgia did not regulate disclosures accompanying the sale of insurance, and, even if it did, TIL would not conflict with Georgia law. We agree that the McCarran Act does not bar application of TIL, but for different reasons.
 
 
 9
 The McCarran Act is explored in depth in Cochran v. Paco, Inc., ante, 606 F.2d 460, and we refer the reader to that opinion for essential background. There we held that the lending activities of a premium finance company do not constitute the "business of insurance" and that the McCarran Act does not preclude application of TIL's disclosure requirements. Similarly, in Perry v. Fidelity Union Life Ins. Co., ante, 606 F.2d 468, we concluded that premium financing by an insurance company in connection with the sale of an insurance policy is not the "business of insurance" for McCarran Act purposes, and that TIL is thus applicable to such a loan transaction.
 
 
 10
 The instant case presents a hybrid situation. Plaintiffs contend that Community made a "credit sale" of an insurance policy and thus should have made the disclosures required when a credit sale occurs. See footnote 8, Infra. For purposes of our McCarran Act analysis, we assume that the loan managers, acting in their dual capacities as employees of Community and licensed agents of American Family, made a credit sale of cancer insurance and that Community was a "seller" under TIL.
 
 
 11
 The sale of an insurance policy is undoubtedly the "business of insurance" for McCarran Act purposes. Securities & Exchange Comm'n v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). However, Perry makes clear that the lending activities of an insurance company are apart from that business: "the financing activity is purely ancillary to the insurance relationship between the insurance company and the policyholder." 606 F.2d at 470. Thus, Community's Selling of the cancer insurance policies constituted the "business of insurance," although its Financing of them on a credit sale basis did not.
 
 
 12
 The mere fact that Community sold the policies that it financed does not preclude application of TIL, since the financing is insufficient to invoke the McCarran Act exemption. Accordingly, any inquiry into the nature of state regulation or the conflict between the state scheme and TIL is unnecessary. Cochran v. Paco, Inc., supra, 606 F.2d at 467 n.15. We thus turn to the TIL questions presented by this case.
 
 III. THE TRUTH IN LENDING ACT
 
 13
 Plaintiffs urged in the district court that the transaction involved not only a loan but also a credit sale of an insurance policy as to which the required disclosures had not been made. Community contended that the transaction was simply a loan, that all consumer loan disclosures had been made in accordance with TIL, and that no credit sale disclosures were required.
 
 
 14
 The gravamen of plaintiffs' complaint was that Community made disclosures only as to the total amount of the loan and did not make separate disclosures as to the cost of financing the annual premiums on the cancer policies. The Touchstone transaction is illustrative. At the top of one legal-size page, Community made the following disclosures:
 
 
 15
 Date finance charge begins to accrue_________ 02-08-73
Schedule of Payments__________ one of $85 and 23 of $85
Total payments_______________________________ $2040.00
Interest_____________________________________ $ 281.38
Service fee__________________________________ $ 105.60
FINANCE CHARGE_______________________________ $ 386.98
Amount financed______________________________ $1653.02
Life Insurance premium_______________________ $ 76.70
Disability insurance premium_________________ $ 71.40
Property insurance premium___________________ $ 0.00
Official fees________________________________ $ 3.50
Net to customer(s)___________________________ $1501.42
ANNUAL PERCENTAGE RATE_______________________ 21.07%
Amount of insurance
 Life______________________________________ $2040.00
 Disability ins. benefits__________________ $ 85.00
Term (mos.)__________________________________ 24
First payment due____________________________ 03-15-73
Maturity date________________________________ 02-08-75
Amount of note_______________________________ $2040.00
 
 
 16
 At the bottom of the same page, under the heading "security agreement," the following information appears:
 
 
 17
 Net to customer(s)__________________________ $1501.42
Less balance on (former loan)_______________ $ 660.28
Check payable to Interstate Securities______ $ 505.30
Check payable to Bankers Trust Co.__________ $ 190.00
Check payable to American Family Life
 Assurance Comp.___________________________ $ 60.00
 Cash received_______________________ $ 85.84
 
 
 18
 Record at 685.
 
 
 19
 The district court held that there was a credit sale within the meaning of TIL and that the required disclosures[8] had not been made. The court also rejected Community's "good faith" or "bona fide error" defense[9] and determined that each plaintiff and each class member were entitled to the $100 statutory penalty since each is a "customer" to whom disclosures should have been made.[10] Thus, Mr. and Mrs. Touchstone, joint obligors on their single loan, each received $100.
 
 A. Credit Sale
 
 20
 Under 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(t), the term " credit sale" is defined as "any sale with respect to which credit is extended or arranged by the seller." The sale of insurance is clearly a sale within the meaning of TIL. Stefanski v. Mainway Budget Plan, Inc., 456 F.2d 211 (5 Cir. 1972). Moreover, Community admittedly "extended" credit to the purchasers of the cancer insurance policies. The only question, then, is whether Community was a "seller" within the meaning of § 1602(g).
 
 
 21
 The district court held that Community was a seller under two theories. First, the court concluded that Community was a "proximate cause" of or a "substantial factor" in the sale, borrowing those terms from cases involving Securities Act violations. See, e. g., Lewis v. Walston & Co., 487 F.2d 617, 621-22 (5 Cir. 1973); Hill York Corp. v. American Int'l Franchises, Inc., 448 F.2d 680, 692-93 (5 Cir. 1971). Alternatively, the court determined that Community was a seller under agency principles, since Community authorized and encouraged its loan managers to sell the cancer insurance.
 
 
 22
 Community argues that, under Georgia law, there is no "sale" of an insurance policy until the application for such a policy is accepted by the insurer. See, e. g., Sasser v. Coastal States Life Ins. Co., 113 Ga.App. 17, 147 S.E.2d 5 (1966). Therefore, Community contends, only American Family could be a "seller" since it had the authority to accept or reject the applications.
 
 
 23
 We find this argument unpersuasive for several reasons. First, it ignores Community's role in the merchandising process and instead emphasizes the moment at which a contractual agreement actually arose. Since TIL is " consumer protection" legislation, we think the appropriate focus should be on the time of the contact with the consumer. That is, we must examine the transaction through the eyes of the consumer, and the transactions in the instant case, viewed in such a manner, involved a sale of cancer insurance by the loan managers. Cf. Meyers v. Clearview Dodge Sales, Inc., 539 F.2d 511, 514-15 (5 Cir. 1976), Cert. denied, 431 U.S. 929, 97 S.Ct. 2633, 53 L.Ed.2d 245 (1977) (seller who prearranges credit for consumer is creditor under TIL). From the plaintiffs' perspective, Community was obviously selling the insurance policies, for plaintiffs' only contact with any organization concerning the policies was with Community's loan managers during normal office hours. Even if the loan managers were "wearing two hats," the one marked "American Family" was all but invisible to the plaintiffs.[11]
 
 
 24
 Second, under 12 C.F.R. § 226.8(a), a creditor must make TIL disclosures "before the transaction is consummated." Section 226.2(kk) provides that a "transaction shall be considered consummated at the time a contractual relationship is created . . . ." Thus, although state law is determinative of when a contractual relationship is created, it has nothing whatsoever to do with how the transaction is to be characterized for TIL purposes. The obligation to disclose arises before the creation of a contractual relationship, and it would be circular to define the nature of the transaction which determines the particular disclosures that are required in terms of the state law governing the contract's formation. We thus characterize the transaction as a matter of federal law. Starks v. Orleans Motors, Inc.,372 F.Supp. 928, 931 (E.D.La.) (Rubin, J.), Aff'd, 500 F.2d 1182 (5 Cir. 1974).[12]
 
 
 25
 Third, we have stressed that TIL is a remedial statute that is to be liberally construed in favor of the consumer. Sellers v. Wollman, 510 F.2d 119, 122 (5 Cir. 1975); See also McGowan v. King, Inc., 569 F.2d 845, 848 (5 Cir. 1978); Thomas v. Myers-Dickson Furniture Co.,479 F.2d 740, 748 (5 Cir. 1973). A hyper-technical interpretation of "seller" or "sale" based on state law would be contrary to this principle.
 
 
 26
 Finally, we agree with the district court that "applications to the insurance company provided no information upon which the company could chose to reject them, . . . and the final step in the consummation of the sales transaction in question was a mere formality." Record at 534. In terms of the overall consumer transaction, American Family's only function was to rubber stamp the applications and issue the policies.
 
 
 27
 Having concluded that state law is not dispositive of Community's status, we now examine that issue in terms of the loan company's role in the merchandising of the insurance and its business relationship with American Family. Although we have doubt as to the viability of the district court's "proximate cause" theory in the TIL context, we are convinced that the record is more than sufficient to establish Community's status as a "seller" by virtue of its relationship with American Family and by application of simple agency principles.
 
 
 28
 Aristar, Community's corporate parent, clearly developed the cancer insurance sales program as a profitable sideline that would help develop new loan business, increase revenue to the tune of a projected annual gross of $1.5 million, and provide a bonus or incentive plan for Community's loan managers and supervisory personnel. American Family's role was to underwrite the CancerCare policies sold by Community's loan managers, who were also licensed agents of American Family.
 
 
 29
 We thus view the program as a type of joint venture between American Family and the Aristar family, with American Family providing the policy and Community the marketing. Aristar undoubtedly benefited from the arrangement, for Diamond State, acting as the general and receiving agent for sales commissions, received half of each premium, retained 25%, and paid the remainder in commissions to the Community loan manager who made the sale and to his district supervisor. Thus, Community's incentive plan was paid for by Diamond State, its sister subsidiary.
 
 
 30
 Given this business arrangement, Community's argument that the loan managers were selling the insurance policies strictly on behalf of American Family simply does not wash. To draw such a bright, bold line between the loan managers' dual functions would be to ignore reality, since a business relationship obviously existed between American Family and the Aristar conglomerate.[13] The fact that the loan managers were licensed agents of American Family does not indicate that they were working solely for that company, but rather that their licensing was a necessary part of the business venture between American Family and the Aristar group, just as Community's authorizing the sale of cancer policies at its loan offices was an essential part of the arrangement.[14]
 
 
 31
 Given the existence of the business relationship described above, it follows that the loan managers acted on behalf of both American Family and Community in selling the cancer insurance policies. The sales could not have been made without the cooperation and agreement of both American Family and Community. For its part, Community authorized and encouraged every significant phase of the sales program, and the loan managers obviously could not have made on-the-job sales of this type of insurance without permission of the loan company. The loan managers thus made the insurance sales within the scope of their employment by Community, See Restatement (2d) of Agency § 229(1) (1957),[15] and the loan company is responsible as a principal for the actions of its agents. Accordingly, we hold that Community is a "seller" within the meaning of TIL.
 
 B. Disclosures
 
 32
 Having determined that a "credit sale" occurred and that Community was a "seller," we now consider whether Community made the disclosures required by 15 U.S.C. § 1638(a) and 12 C.F.R. § 226.8(c).[16]
 
 
 33
 Community does not, in its brief on appeal, challenge the district court's holding that the "credit sale" disclosures were not made. They undoubtedly were not. Under the statute and regulations, the cash price (here, the insurance premium) and the actual cost of the credit (I. e., the finance charge) must be disclosed. All that was disclosed here was that a certain amount of money from the loan to the customer was being sent to American Family. See typical disclosure set out at page 503, Supra. The only finance charge shown is that for the entire amount of the loan, and the consumer is thus unable to determine exactly what he is paying for the credit to enable him to purchase the insurance policy. As the district court said:
 
 
 34
 By failing to make credit sale disclosures (regarding the insurance), defendants were able to extract painlessly an extra profit from loan customers, who in many cases simply signed or made their mark as instructed, and took home the proceeds, less deductions for various items including the cancer insurance premium. Truth-in-Lending was designed to require disclosure of the terms of credit sales, to insure that lenders would make borrowers aware of what they were agreeing to.
 
 
 35
 Record at 684.
 
 C. Penalty Awards
 
 36
 Under the version of 15 U.S.C. § 1640(a) in effect when this suit was brought,[17] a creditor in a consumer credit transaction who fails "to disclose to any person" any information required to be disclosed is liable to that person for an amount ranging from $100 to $1000 based on twice the finance charge and reasonable attorneys' fees. Community contends that the district court erroneously held that each plaintiff was entitled to the minimum $100 award, since some plaintiffs were co-obligors on the same loan. Community argues that the proper measure of recovery is $100 per credit transaction, regardless of how many plaintiffs were involved in a particular loan.
 
 
 37
 This court recently held that a husband and wife who signed a promissory note and who were jointly and severally liable under state law were entitled to two statutory penalties. Davis v. United Companies Mortgage & Inv., Inc., 551 F.2d 971 (5 Cir. 1977). Because plaintiffs such as the Touchstones were jointly and severally liable as principals under the terms of the note itself, the district court properly made an award to each.
 
 IV. CONCLUSION
 
 38
 Community merchandised the CancerCare insurance policies through its loan offices as part of its overall business and extended credit for the purchase of that insurance. The company was thus a credit seller under TIL responsible for making "credit sale" disclosures to its customers. Those disclosures were not made, and each plaintiff is thus entitled to a statutory award. The McCarran Act is no bar to TIL's application here, since the lending activities of Community do not constitute the "business of insurance." The judgment of the district court is thus affirmed.
 
 
 39
 AFFIRMED.
 
 JOHN R. BROWN, Chief Judge, dissenting:
 
 40
 The Court has affirmed the District Court's application of TIL in this case, but on different grounds than those on which the District Court relied. The panel has held that TIL should be invoked because this case involves the financing, and not the sale, of insurance. Thus, under the Court's reasoning in Perry v. Fidelity Union Life Insurance Company, 606 F.2d at 468, McCarran is inapplicable. I dissent from this holding for two reasons.[1]
 
 
 41
 First, the Court has assumed, and I think correctly, that the Community loan managers made credit sales of cancer insurance. However, the Court was incorrect in bisecting the transaction into separate parts, a sale of insurance and a financing of the sale. The transaction was a credit sale. This is a species of sale, but a sale nonetheless. Although the McCarran Act is as inscrutable as Mona Lisa in many respects, there is one principle upon which the Court and I agree: the sale of an insurance policy is squarely within the "business of insurance," as is the licensing of agents, Ante, 606 F.2d at 503. SEC v. National Securities, Inc., 1969, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668. Therefore, McCarran should exempt the defendants from TIL if TIL would invalidate, impair or supersede applicable Georgia law.
 
 
 42
 Second, even if I could agree with the Court that the issue here is financing, separate and apart from the sale of insurance, I would still disagree with their result for reasons stated in my dissent in Perry, ante, 606 F.2d at 475-478. The Court has assumed that Community was an insurance seller. I am convinced that financing of premiums by the one selling the insurance is part of the "business of insurance" which is covered by the McCarran Act. When an insurance seller offers premium financing in conjunction with the sale of insurance, this financing is an inducement to the purchaser to buy. It is such an integral part of the actual sale that the insurer-insured relationship, emphasized in National Securities, 393 U.S. at 460, 89 S.Ct. 564, is directly involved. This is the "business of insurance" which McCarran exempts from federal control.
 
 
 43
 Having expressed my opinion on this issue in favor of the application of the McCarran Act, I now must, as I did in my dissent in Perry, ante, 606 F.2d at 475, apply the analytical construction of Cochran v. Paco, 606 F.2d at 464, to the questions not addressed by the Court: (i) whether Georgia regulates the business of insurance within the meaning of § 2(b) and (ii) if so, whether application of TIL would invalidate, impair or supersede applicable state law.
 
 
 44
 The District Court held in effect that Georgia did not regulate the business of insurance because insurance companies and their agents are exempted from the only Georgia statute directed toward credit disclosures.[2] The Court went further to state that even if Georgia required insurance companies to disclose credit terms, there would be no invalidation, impairment or supersession of state law in view of § 111 of TIL, 15 U.S.C.A. § 1610.[3] I cannot agree.
 
 
 45
 Inherent in the District Court's conclusion is the assumption that to exempt insurance agents or premiums in connection with sickness insurance is tantamount to a failure to regulate for McCarran Act purposes. This assumption eviscerates McCarran and effects its repeal the precise result its authors so assiduously sought to avoid. See dissent in Perry, ante, 606 F.2d at 473-474 & n. 10, and Appendix excerpts (2), (4)-(6), (22), Ante, 606 F.2d at 484. Moreover, pronouncing that Georgia does not regulate within the meaning of § 2(b) by exempting insurance companies from making premium credit disclosures strips that State of the right granted to it under the McCarran Act to regulate in a manner it deems best in a situation where Congress has not specifically related the statute to the business of insurance.[4] See dissent in Perry, ante, 606 F.2d at 475, and Cochran, ante, 606 F.2d at 464 and authorities cited therein.
 
 
 46
 First, Georgia comprehensively regulates the business of insurance and the sale of insurance policies. See generally Ga.Code Title 56. There is no doubt about this and plaintiffs do not contend otherwise. Second, Georgia has regulated the financing of insurance premiums through the Georgia Insurance Premium Finance Company Act, Ga.Code Ann. § 84-5301. The Georgia Legislature has also mandated that credit disclosures be made in insurance premium financing arrangements. Ga.Code Ann. § 84-5309(c). But what is significant here is the fact that Georgia specifically and affirmatively exempted from the requirements of this Act not only "(a)ny insurance company authorized to do business in the State of Georgia or Any licensed resident local agent as to premiums on business produced by such agent" (Ga.Code Ann. § 84-5302(a)), but also "(i)nsurance premiums in connection with the kinds of business defined in . . . section 56-404 (accident and Sickness insurance) of the Georgia Insurance Code" (Ga.Code Ann. § 84-5302(e); emphasis added).
 
 
 47
 I would hold that these exemptions fall squarely within the Fifth Circuit standard for "regulating" announced in Crawford v. American Title Ins. Co., 1975, 518 F.2d 217, 218, which I followed in my dissent in Perry, ante, 606 F.2d at 481-482.
 
 
 48
 The McCarran Act renders the federal (act) inapplicable when state legislation generally proscribes, Permits or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision.
 
 
 49
 (Emphasis added.) Georgia has chosen to Permit insurance agents not to make the credit term disclosures mandated in Ga.Code Ann. § 84-5309(c). Thus, even assuming, as plaintiffs urge, that the "conduct in question" is making credit term disclosures rather than selling insurance policies, the Crawford test is satisfied.
 
 
 50
 As to the final question, were we to place our imprimatur on the District Court's reading of McCarran, we would not only be superimposing additional requirements, which I declined to do in my dissent in Perry, ante, 606 F.2d at 482-483, but we would be construing TIL to invalidate completely the Georgia exemptions in direct contravention of § 2(b). We can think of no clearer "conflict," to use the District Court's term,[5] than exists where a state has Affirmatively Relieved insurance companies and their agents and certain premiums from credit disclosure requirements. The nonaction purposeful and noninadvertent that is expressly legal for an insurance agent in Georgia would be expressly illegal under federal law.[6] TIL's application would thus amount to invalidation with a vengeance and reduce McCarran to a nullity.
 
 
 51
 The plaintiffs argue and I acknowledge that the result I would reach here would mean that no credit sale disclosures have to be made by insurance companies and their agents in Georgia.[7] But this Court has no charter to cure that. Georgia has demonstrated, by enactment of the Premium Finance Company Act, its know-how and ability to impose disclosure requirements when it chooses to do so. Congress has displayed equivalent abilities in specifically relating federal legislation to the insurance business; witness, for example, its action with respect to the National Labor Relations Act and the Fair Labor Standards Act, 15 U.S.C.A. § 1014. When and if these legislative bodies subsequently decide that insurance companies and agents should not enjoy this immunity, they will find an obedient ear in the Fifth Circuit. Until then, we must confine our legislative activities to "molecular motions."[8]
 
 
 
 [1]
 Cochran v. Paco, Inc., 606 F.2d 460 (5 Cir. 1978); Perry v. Fidelity Union Life Ins. Co., 606 F.2d 468 (5 Cir. 1978)
 
 
 [2]
 Aristar officials recognized that their small loan customers were a potential "captive market," Record at 191, and one memorandum projects an annual gross of more than $1.5 million. Id. at 188
 
 
 [3]
 Some Aristar officials feared customer dissatisfaction because of the policy's limited benefits. The company was also aware that many states prohibit the sale of cancer insurance
 
 
 [4]
 For example, a Community vice-president wrote certain Georgia supervisors on March 20, 1973, about cancer insurance sales. The letter reads in pertinent part:
 We have been advised by Mr. Beck with American Family Life Assurance Company of Columbus (CANCER CARE) that his company is receiving complaints from our customers.
 It seems we are guilty of not selling the policies, but instead are adding them on the loan without the customer's knowledge or consent.
 THIS PRACTICE MUST BE STOPPED IMMEDIATELY.
 We must have the customer's consent, and he must be aware of the cost, benefits, and amount of yearly premiums.
 R. at 221.
 
 
 [5]
 For example, the Touchstone-Singleton complaint alleged that Community failed to: (1) disclose the cash price of the cancer insurance policy using the term "cash price" as required by 12 C.F.R. § 226.8(c)(1); (2) disclose the amount financed in the credit sale using the term "amount financed" as required by § 226.8(c)(7); (3) disclose the finance charge attributed to the credit sale and label such as "finance charge," as required by § 226.8(c)(8) (i); and (4) disclose the finance charge as an annual percentage rate using the term "annual percentage rate," as required by § 226.8(b)(2). Record at 727
 
 
 [6]
 The complaints did not allege violations of TIL's consumer loan disclosure requirements, 15 U.S.C. § 1639, 12 C.F.R. § 226.8(d). The district court found as a fact that such disclosures were made. On appeal, plaintiffs characterize this finding as dictum; however, they did not cross-appeal and the issue is thus not before us. Fain v. Caddo Parish Police Jury, 564 F.2d 707, 709 n.3 (5 Cir. 1977)
 
 
 [7]
 15 U.S.C. § 1012 provides:
 (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
 
 
 [8]
 15 U.S.C. § 1602(g) states that "(t)he term 'credit sale' refers to any sale with respect to which credit is extended or arranged by the seller. . . ."
 15 U.S.C. § 1638(a) governs credit sales and requires the creditor to "disclose each of the following items which is applicable":
 (1) The cash price of the property or service purchased.
 (2) The sum of any amounts credited as downpayment (including any trade-in).
 (3) The difference between the amount referred to in paragraph (1) and the amount referred to in paragraph (2).
 (4) All other charges, individually itemized, which are included in the amount of the credit extended but which are not part of the finance charge.
 (5) The total amount to be financed (the sum of the amount described in paragraph (3) plus the amount described in paragraph (4)).
 (6) Except in the case of a sale of a dwelling, the amount of the finance charge, which may in whole or in part be designated as a time-price differential or any similar term to the extent applicable.
 (7) The finance charge expressed as an annual percentage rate except in the case of a finance charge
 (A) which does not exceed $5 and is applicable to an amount financed not exceeding $75, or
 (B) which does not exceed $7.50 and is applicable to an amount financed exceeding $75.
 A creditor may not divide a consumer credit sale into two or more sales to avoid the disclosure of an annual percentage rate pursuant to this paragraph.
 (8) The number, amount, and due dates or periods of payments scheduled to repay the indebtedness.
 (9) The default, delinquency, or similar charges payable in the event of late payments.
 (10) A description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates.
 
 
 [12]
 C.F.R. § 226.8(c) provides:
 Credit Sales. In the case of a credit sale, in addition to the items required to be disclosed under paragraph (b) of this section, the following items, as applicable, shall be disclosed:
 (1) The cash price of the property or service purchased, using the term "cash price."
 (2) The amount of the downpayment itemized, as applicable, as downpayment in money, using the term "trade-in" and the sum, using the term "total downpayment."
 (3) The difference between the amounts described in subparagraphs (1) and (2) of this paragraph, using the term "unpaid balance of cash price."
 (4) All other charges, individually itemized, which are included in the amount financed but which are not part of the finance charge.
 (5) The sum of the amounts determined under subparagraphs (3) and (4) of this paragraph, using the term "unpaid balance."
 (6) Any amounts required to be deducted under paragraph (e) of this section using, as applicable, the terms "prepaid finance charge" and "required deposit balance," and, if both are applicable, the total of such items using the term "total prepaid finance charge and required deposit balance."
 (7) The difference between the amounts determined under subparagraphs (5) and (6) of this paragraph, using the term "amount financed."
 (8) Except in the case of a sale of a dwelling:
 (i) The total amount of the finance charge, using the term "finance charge," and where the total charge consists of two or more types of charges, a description of the amount of each type, and
 (ii) The sum of the amounts determined under subparagraphs (1), (4), and (8) (i) of this paragraph, using the term "deferred payment price."
 
 
 [9]
 15 U.S.C. § 1640(c) provides:
 A creditor may not be held liable in any action brought under this section for a violation of this subchapter if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.
 The district court concluded that this section applies only where the lender made a clerical error, not where, as here, there was a mistake of law. See McGowan v. King, Inc., 569 F.2d 845, 849 (5 Cir. 1978). Community does not challenge this holding on appeal.
 
 
 [10]
 12 C.F.R. § 226.2(u) defines "customer" as a cardholder (as defined in § 226.2(m)) or "a natural person to whom consumer credit is offered or to whom it is or will be extended, and includes a comaker, endorser, guarantor, or surety for such natural person who is or may be obligated to repay the extension of consumer credit." Former § 226.2(O ), in effect when this action was brought, contained the same definition, except for inclusion of the term "cardholder."
 
 
 [11]
 Interestingly, Community's correspondence characterized the transactions as "sales." For example, Mr. Murphy wrote an American Family official that "it is not possible for Us to sell this policy . . . in all of our operating units in every state." Record at 191 (emphasis added). In a memo to the president of Diamond State, Murphy explained that if "We sold this policy to our customers, we would get an immediate commission. . . ." Record at 189 (emphasis added)
 
 
 [12]
 Contrary to Community's assertion, this approach is not violative of 15 U.S.C. § 1610(b), which provides that TIL "does not otherwise annul, alter or affect in any manner . . . the laws of any State . . . ." Our analysis of whether Community is a "seller" applies only in the context of TIL and does not alter in any respect Georgia law that determines when a sale occurs
 
 
 [13]
 We recognize that our analysis of this relationship involves the piercing of Aristar's corporate veil to a limited extent. We are willing to wield a sufficiently sharp instrument in these circumstances, for to recognize the Aristar companies as separate corporate entities would result in thwarting the clear legislative purpose of TIL: "to assure a meaningful disclosure of credit terms so that the customer will be able to . . . avoid the uninformed use of credit." 15 U.S.C. § 1601. See also Mourning v. Family Publications, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). We note that Georgia recognizes utilization of the "corporate veil" doctrine when "to observe (the corporate entity) would be to work an injustice." Farmers Warehouse v. Collins, 220 Ga. 141, 137 S.E.2d 619, 625 (1964)
 In addition, various internal memoranda indicate that the profits from cancer insurance sales were going into one corporate "pot." For example, Community's president wrote his Diamond State counterpart that "(i)f we sold this policy to our customers, we would get an immediate commission. . . ." Record at 189. Under the plan, however, Diamond State would receive the commissions from the policies sold to Community's customers. Cf. Stefanski v. Mainway Budget Plan, Inc., supra, 456 F.2d at 212.
 
 
 [14]
 The record makes clear, and the district court found, that the dominant force behind the plan was William W. Murphy, president of Community, chief operating officer of Aristar's financial division, and vice-president of Aristar's wholly-owned management subsidiary. Mr. Murphy participated in initial discussions with American Family representatives, touted the insurance sales program to his fellow corporate officers, and insisted that the program be tried on an experimental basis in Georgia. In addition, he authorized Community's loan managers in Georgia to serve as American Family's agents in writing cancer insurance, established policies and procedures for the loan managers to follow, approved a commission system, and directed that training sessions be held for the loan managers. Mr. Murphy also temporarily terminated the insurance program in April 1973 but subsequently permitted it to be re-established
 
 
 [15]
 The Restatement provides:
 To be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
 
 
 [16]
 See footnote 8, Supra
 
 
 [17]
 The statute was amended in 1974, Pub.L. No. 93-495, Title IV, § 408(a) (Oct. 28, 1974), 88 Stat. 1518, and the parties stipulated in the district court that these amendments are not applicable to this action
 
 
 [1]
 I now concur in Part III of the Court's opinion concerning Truth in Lending matters
 
 
 [2]
 The District Court reasoned as follows:
 To apply the McCarran-Ferguson Act as broadly as defendants suggest would effectively bar the application of any federal statute Relevant to the business activities of insurance companies regardless of whether state legislation covered the specific transaction in question or not.
 Feb. 28, 1975 opinion, R. at 529, App. at 47 (emphasis added). But barring the application of any federal statute enacted under the Commerce Clause in the absence of a clear Congressional expression Specifically relating that act to the business of insurance (as opposed to a "relevant" test) is exactly what the McCarran Act is all about. See dissent in Perry, ante, 606 F.2d at 473-474 & nn. 8-10, 475, 483.
 
 
 [3]
 The Court in effect held that Georgia did not regulate this aspect of the business of insurance, and even if it did, there was no conflict with federal law:
 However, defendants cite no Georgia legislation specifically overriding or superseding the Truth-in-Lending Act, nor do they demonstrate how application of this Act would interfere with state legislation. Moreover, research reveals that the only Georgia statute directed toward disclosures accompanying sales of insurance exempts all insurance companies and their local agents from its coverage. Ga.Code Ann. §§ 84-5302 and 84-5309. Therefore, no conflict exists between requirements under Georgia law and under the Truth-in-Lending Act. And even if the State of Georgia had passed legislation requiring disclosures in the sale of insurance, the Truth-in-Lending Act could not be interpreted as invalidating, impairing, or superseding state law since section 111 of the Act specifically provides that "(t)his title does not annul, alter, or affect, or exempt any creditor from complying with, the laws of the State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this title or regulations thereunder, and then only to the extent of their inconsistency." 15 U.S.C. § 1610(a). Consequently, the Federal Reserve Board has determined that the credit sale of insurance is governed by the Truth-in-Lending Act.
 Logic also dictates the rejection of the defendants' position. To apply the McCarran-Ferguson Act as broadly as defendants suggest would effectively bar the application of any federal statute relevant to the business activities of insurance companies regardless of whether state legislation covered the specific transaction in question or not. This interpretation justifiably has not been accorded the McCarran Act by federal courts in other contexts. E. g., Atlantic & Pacific Insurance Co. v. Combined Ins. Co., 312 F.2d 513, 515 (10th Cir. 1962); Sears, Roebuck & Co. v. All States Life Insurance Co., 246 F.2d 161, 172 (5th Cir. 1957); Zachman & Erwin, 186 F.Supp. 691, 694 (S.D.Texas 1960).
 
 
 [4]
 The plaintiffs maintained below and asserted at oral argument that TIL specifically relates to the business of insurance. The District Judge did not reach the issue because he found no invalidation, impairment or supersession of state law. The Court holds in Cochran that TIL does not specifically relate to the business of insurance, see Ante, 606 F.2d at 464 and authorities there cited
 Plaintiffs also assert that 15 U.S.C.A. § 1633 provides the exclusive mechanism by which states can exempt credit transactions from TIL's requirements. I rejected this same contention in my dissent in Perry, ante, 606 F.2d at note 34, p. 483.
 
 
 [5]
 The mere absence of conflict is not the litmus test for applying McCarran. "Invalidate, impair, or supersede" includes the displacement of, or the superimposition of federal requirements on, transactions that are tailored to meet state requirements. Dissent in Perry, ante, 606 F.2d at 482-483
 
 
 [6]
 It has long been a settled McCarran principle that the states can make legal activities of insurance companies uniform rates, for example that would otherwise be illegal under federal law as long as § 2(b) standards are met and these activities do not constitute boycott, coercion or intimidation within 15 U.S.C.A. § 1013(b). E. g., Dexter v. Equitable Life Assurance Society, 2 Cir., 1975, 527 F.2d 233, 236; Meicler v. Aetna Casualty & Surety Co., 5 Cir., 1975, 506 F.2d 732; Perry dissent Appendix, Ante, 606 F.2d at 484, excerpts (2), (16), (19)
 
 
 [7]
 In Cochran, ante, 606 F.2d at 460 we held that independent insurance premium finance companies were not exempted from making such disclosures by virtue of the McCarran Act because their activities were not part of the "business of insurance" within the meaning of § 2(b)
 
 
 [8]
 I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions
 Southern Pacific Co. v. Jensen, 1917, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (Holmes, J., dissenting).