609 F.2d 1179
 54 A.L.R.Fed. 813
 Mattie WILLIAMS, Plaintiff-Appellee, Cross-Appellant,
v.
PUBLIC FINANCE CORPORATION, Defendant-Appellant, Cross-Appellee.
Ruth A. JACKSON, Plaintiff-Appellee, Cross-Appellant,
v.
USLIFE CREDIT CORPORATION, Defendant-Appellant, Cross-Appellee.
Linda L. SMITH, Plaintiff-Appellee,
v.
PUBLIC FINANCE CORPORATION, Defendant-Appellant.
Leonard and Cora SINGLETARY, Plaintiffs-Appellees,
v.
PUBLIC FINANCE CORPORATION, Defendant-Appellant.
 Nos. 77-1337, 77-1706, 77-2112 and 77-3213.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 18, 1980.
 
 Allen I. Hirsch, Charles L. Gregory, Atlanta, Ga., for defendant-appellant in Nos. 77-1337, 77-2112 and 77-3213.
 Lewis N. Jones, Atlanta, Ga., for defendant-appellant in No. 77-1706.
 Joseph H. King, Jr., Atlanta, Ga., for plaintiffs-appellees in Nos. 77-1337, 77-1706 and 77-2112.
 John L. Green, Ralph Goldberg, Atlanta, Ga., for plaintiffs-appellees in No. 77-3213.
 Appeals from the United States District Court for the Northern District of Georgia.
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 (Opinion July 5, 1979, 5 Cir., 1979, 598 F.2d 349).
 Before GOLDBERG, SIMPSON and CLARK, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 In our original opinion in this case,[1] we held (1) that the loans made by appellants, including those which refinanced prior usurious loans,[2] were illegal under the Georgia Industrial Loan Act (ILA), Ga.Code Ann. §§ 25-301, Et seq., § 25-9903, and therefore were "null and void"; (2) that appellants were liable for violating the disclosure provisions of the federal Truth-in-Lending (TIL) Act, 15 U.S.C. §§ 1601, Et seq., in connection with these loans, even though the ILA violations rendered the loans "null and void"; and (3) that the damages for the TIL Act violations were twice the finance charge attempted to be imposed, not the statutory minimum fine of $100. On petition for rehearing, appellants attack primarily our second conclusion, that the loans violated both the ILA and the TIL Acts.[3] Appellants argue that this conclusion was "partially based" on our misapprehension of the effect of an ILA violation. They cite Georgia Investment Co. v. Norman, 231 Ga. 821, 204 S.E.2d 740 (1974), for the proposition that under the ILA a borrower's remedy is not limited to the creditor's forfeiture of the balance due on the loan, as we assumed in our original opinion; rather, the borrower is also able to recover any money he paid to the lender in excess of the actual cash received under the note. While we did misapprehend the total effect of an ILA violation by failing to take cognizance of the Norman rule, the thrust of our analysis of this issue remains unparried in this new attack. We thus adhere to our original result and mode of analysis.
 
 
 2
 In this case, appellants conceded that they did not comply with the disclosure provisions of the TIL Act, but argued that if the loans were void under the ILA, as we found them to be, the TIL Act had no application. This result followed, they contended, because the ILA rendered the loans void Ab initio and thus the loans were not consumer credit transactions within the meaning of 15 U.S.C. § 1639(a) or "credit . . . extended" within the meaning of § 1631(a). Noting that the effect of appellants' argument was to ask for "special lenient treatment to lenders who violate two laws instead of just one," we rejected the approach to the question proposed by the appellants and defined our inquiry in the following terms:
 
 
 3
 (W)e think the real question in this case is a relatively standard one of statutory interpretation. More specifically, we think the question is whether Congress intended that the TIL Act would apply to loans which violated state usury laws punishable by forfeiture. At the outset we note that no exception for such loans is made explicitly in the TIL Act. Moreover, since the Act is to be construed liberally to effect its remedial purposes, Thomas v. Myers-Dickson Furniture Co., 479 F.2d 740, 748 (5th Cir. 1973), we are generally disinclined to read into the Act an implicit exception which benefits lenders at the expense of borrowers. However, the real test of whether this exception was intended or not must start with the question of whether it serves or disserves the purposes of the Act.
 
 
 4
 598 F.2d at 355.
 
 
 5
 Appellants have raised no substantial new challenge to two parts of our original analysis of the question at hand. We noted there that § 1640 of the TIL Act made a lender who violated that act liable to the borrower for both the borrower's actual damages under § 1640(a)(1) and twice the finance charge under § 1640(a)(2)(A)(i). "Since the double finance charge penalty . . . is explicitly a bonus penalty in the Act, to be assessed in addition to actual damages, we are not persuaded by an argument that the penalty is excessively harsh or an unintended windfall in cases in which a state law remedy for an unrelated state law violation simply reduces the borrower's actual damages." 598 F.2d at 356 (footnote omitted).
 
 
 6
 More significantly in terms of the purposes of the TIL Act, we indicated that our holding that appellants' violation of the ILA did not immunize them from damages under the TIL Act followed A fortiori from Sellers v. Wollman, 510 F.2d 119 (5th Cir. 1975). Sellers stated that a borrower could recover the double finance charge penalty of § 1640(a)(2)(A)(i) even when the loan transaction was rescinded under another section of the TIL Act, 15 U.S.C. § 1635, and thus even when no finance charge was actually paid.[4] This result was required there because the purposes underlying the civil penalty for nondisclosure and those underlying the right of rescission were distinct and because a forced election between the two remedies would undermine the effectiveness of the TIL Act without furthering other goals:
 
 
 7
 The purpose of making creditors civilly liable is to force disclosure of credit terms. The purpose of according borrowers a right of rescission is broader; not only is it designed to compel disclosure, but it also serves to blunt unscrupulous sales tactics by giving homeowners a means to unburden themselves of security interests exacted by such tactics. See 114 Cong.Rec. 1611 (1968) (remarks of Cong. Cahill). If borrowers were forced to choose their "remedies", both objectives might be undermined. To the extent that only civil liability is pursued, the sanction against unscrupulous home sales practices is weakened. To the extent that only rescission is chosen where available the penalty attendant upon nondisclosure will be less severe and, consequently, the incentive to disclose diminished. See Comment, Private Remedies Under the Truth-in-Lending Act: The Relationship Between Rescission and Civil Liability, 57 Iowa L.Rev. 199, 205-07 (1971). Eby, (v. Reb. Realty, Inc., 9th Cir. 1974) 495 F.2d (646) at 652.
 
 
 8
 Sellers, supra, 510 F.2d at 123. We then noted:
 
 
 9
 Indeed, in several ways our case follows A fortiori from the analysis in Sellers. First, the Sellers rule permits a borrower to recover damages under two separate provisions of the TIL Act for a single violation of the Act. In the instant cases we are simply penalizing a lender twice for violating two separate laws. Secondly, the court in Sellers made clear that Congress did not make the remedies in § 1640 and § 1635 mutually exclusive, even though they would be mutually exclusive remedies in traditional common law contract law. If Congress did not imply that the Section 1640 remedy should defer to a related remedy in the same Act for the same violation, then we think it is A fortiori that it did not intend to imply that the Section should give way to a state law remedy for an unrelated state law violation.
 
 
 10
 598 F.2d at 357.
 
 
 11
 In this analysis resides the real focus of our decision. The ILA and TIL Act provide separate remedies to rectify separate wrongs. The ILA limits what a lender subject to its provisions can charge for the use of its money; the TIL Act provisions involved here are designed to penalize and deter an independent wrong arising from nondisclosure.[5] We did not believe, and do not believe, that it subserves the purposes of the TIL Act to read into it an implied exception for loans which violate unrelated state usury laws. As we have already said,
 
 
 12
 we do not think it especially unfair or unjust to order two punishments for a lender who violates two laws. And more to the point, we think it would be directly contrary to the purposes and policies of the TIL Act to excuse a violator from federal penalty simply because he is also liable for a state penalty, especially where that state penalty may often be less harsh than the federal penalty.
 
 
 13
 598 F.2d at 358.
 
 
 14
 It was in the context of the relative harshness of the penalties provided by the ILA and TIL Act that we entered into our discussion of what we perceived as the inadequacies of the ILA penalty to ensure enforcement of the TIL Act. As we there stated,
 
 
 15
 (i)n terms of the purposes of the TIL Act, the lenders argue that a borrower is adequately compensated for any injuries resulting from a TILA violation and a lender is adequately deterred, by the relatively severe forfeiture provision in Georgia's ILA.
 
 
 16
 598 F.2d at 355.
 
 
 17
 We adhere to our conclusion that the ILA is not an "adequate" protector of the TIL Act goals. First, as we have shown above, the ILA and the TIL Act aim at correction of independent wrongs, and their separate penalties reflect determinations by the Georgia legislature and the United States Congress, respectively, of the penalties necessary to compensate and deter these separate wrongs. Second, it would be an anomaly to condition the application of a federal law of nationwide coverage upon the adequacy or inadequacy of one state's remedy for violation of an unrelated state law. Indeed, even if we were to determine that this Georgia usury law did somehow adequately replace the TIL Act, that would not be an end to the question. Another state usury law could very well provide a less "adequate" remedy, which should never be allowed to usurp TIL Act application. Should we then vary the availability of the federal remedy from state to state? Certainly not.
 
 
 18
 Properly understood, our original discussion of the remedies available under the ILA was meant to illustrate this latter point. We attempted to show that the ILA penalties, aimed at remedying violations of its limits on charges for the use of money, do not correlate to what Congress attempted to achieve through its TIL Act penalties for nondisclosure. And while, under the Norman case, the ILA penalties do not "erode" as much as we previously thought especially in the case of refinanced loans ,[6] we still believe the ILA penalties afford an illustration of why TIL Act application should not be conditioned upon the nature of penalties provided for violation of unrelated state laws. We noted in our original opinion that adopting the lender's "implied exception" approach could result in treating lenders who violated two laws more leniently than if they had violated only one. We proposed the following hypothetical. Suppose a borrower repays all but $1 of a $500 loan which has a finance charge of $100. Suppose in addition that the loan violates both the ILA and the TIL Act. Under the ILA and the Norman case, the lender is forced to forfeit the unrepaid $1 and the borrower can bring an action to recover the.$99 he has paid in excess of the $500. Thus, on these facts, the lender's maximum penalty is $100. Under the TIL Act, the lender's penalty would be double the finance charge, or $200, plus the borrower's court costs and attorney's fees. The lender's immunization theory would excuse our lender from the harsher TIL Act penalty because of the unrelated state law violation, whereas another lender who made the same loan and violated the TIL Act, but failed to violate the ILA, would be liable for the full $200 plus costs. While a lender who violates both the ILA and the TIL Act in a refinancing transaction may indeed receive harsh treatment since Norman allows the borrower to recover all he has paid in excess of the Actual cash he received,[7] we are unpersuaded that this fact should change our conclusion. The widely divergent results achieved under such different fact situations caution us against tying the construction of the federal statute too closely to such unrelated state laws.[8] Georgia has established the remedies it thinks necessary to vindicate the policy of its ILA; we think it our duty to ensure likewise that the policy of the TIL Act is vindicated. While this may be in fact an instance of over-regulation of a business by both state and federal law, we are bound to effectuate the purposes of the law Congress has passed and we adhere to our original statement that "our interpretation of the TIL Act should turn not only on the equities in a particular case, but also on the need for effective implementation of the general purposes of the Act." 598 F.2d at 356.
 
 
 19
 We add one final point. We join with Judge Clark's observation in his dissent from the original panel opinion in recognizing that "(t)here is no magic in the small loan business. It operates on the same economic principles that govern any other industry in a free society." 598 F.2d at 362. And we also join in his statement that "(s)tate and federal legislatures have chosen to regulate the consumer loan business, and it is the duty of courts to enforce those regulations ungrudgingly." Id. But we would not be understood in our original opinion as "heaping coals on the heads of lenders." Id. Appellants in their petition for rehearing have taken offense at our characterization of lenders who violate the ILA as "credit wolves" and as wearers of "sheep's clothing" when they also violate the disclosure provisions of the TIL Act. They suggest that such labels have obscured our analysis of the legal issues here. Such most certainly is not the case. Our analysis was and is based on our perception of the proper construction of the federal and state policies, even though their meshing is not nearly as perfect as we and appellants could wish. Nonetheless, as we read the ILA and the TIL Act, appellants have violated both and are subject to the penalties of both. Although appellants' predations may be technical and they may feel we have cried "wolf" too readily, the fact remains that as we read the statutes appellants are guilty of the violations charged.
 
 
 20
 For the reasons set forth in this opinion, the Petition for Rehearing is DENIED, and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 16) the Petition for Rehearing En Banc is DENIED.
 
 
 21
 CHARLES CLARK, Circuit Judge, concurring in part and dissenting in part:
 
 
 22
 While I continue to agree with the result reached by the majority on the Truth-in-Lending Act Issues, I also continue to adhere to the reasoning expressed in my original dissent concerning the effect of the Georgia Industrial Loan Act (ILA) upon a lender's ability to recover monies advanced in connection with a valid note that in part refinanced unpaid principal from prior illegal notes. The decision of the Georgia Supreme Court in Georgia Investment Co. v. Norman, 231 Ga. 821, 204 S.E.2d 740 (1974), is not relevant to this dissenting position. In Norman the court found that the note refinancing earlier notes was itself in violation of the ILA. In the case at hand only the prior, refinanced notes were illegal. Under Georgia law, a lender should be able to recover the actual money advanced pursuant to a lawful note that refinanced a prior illegal note under a theory of money had and received.
 
 
 
 [1]
 Our original opinion is reported at 598 F.2d 349 (5th Cir. 1979)
 
 
 [2]
 Three of these cases, Williams, Smith and Singletary, involved refinancing transactions. Jackson involved a loan which itself violated the ILA
 
 
 [3]
 Appellants do question our two other holdings. As for our conclusion that the loans violated the ILA, appellants raise no new arguments, and we thus adhere to our original reasoning. Our conclusion that the TIL Act penalty is to be twice the finance charge follows from our adherence to our position regarding the lenders' liability under both the ILA and the TIL Act. See 598 F.2d at 358-59
 
 
 [4]
 Section 1635 gives the borrower a right to rescind certain transactions involving security interests in his or her home. Sellers was followed in Gerasta v. Hibernia National Bank, 575 F.2d 580 (5th Cir. 1978)
 
 
 [5]
 The Georgia courts have recognized that the ILA and TIL Act aim at the correction of independent wrongs. In Hobbiest Financing Corp. v. Spivey, 135 Ga.App. 353, 217 S.E.2d 613 (1975), the lender argued that the borrower was estopped from contending that a loan was void under the ILA because the borrower had sought a penalty for lender's TIL Act violation in federal court and had accepted a settlement. The Georgia Court rejected the lender's argument. It stated that the TIL Act action "was a legal tort action authorized by federal law; and it is in no wise an estoppel of (borrowers) to contend the loan contract was void." Id., 217 S.E.2d at 615
 
 
 [6]
 Under Norman, the ILA penalty ceases to "erode" at the point at which the borrower has repaid the amount of cash he has actually received. The Norman rule allows a borrower to recover from a lender any amounts he has paid in excess of actual cash received. Since in a refinancing transaction, such as Norman involved, the borrower actually receives less cash than the total amount of the principal of the note (because part of the principal goes to the repayment of a previous loan), the "erosion" stops sooner than with a regular loan, although how much sooner it stops depends on the particular circumstances of the transaction. See note 7 and accompanying text Infra. The Norman rule applies both to refinancing transactions and to regular loans. See Public Finance Corp. v. Cooper, 149 Ga.App. 42, 253 S.E.2d 435, 437 (1979)
 
 
 [7]
 To show how the Norman rule works in a refinancing transaction, we set forth two slight variations of our hypothetical. First, suppose $50 of the $500 principal represents a refinancing of an old note. Then the actual cash received by the borrower is $450. On the facts of our hypothetical, the lender's total ILA penalty would be $150 the $1 forfeited and the $149 the borrower could recover for payments in excess of cash received ($599-450). Here, the lender would still be treated more leniently under appellants' immunization theory for violating both laws than if he had only violated the TIL Act with its $200 penalty, plus costs
 Second, suppose $50 of the loan were new money and $450 refinanced a previous loan. Under our hypothetical, the lender's penalty for the ILA violation would be $550 the $1 forfeiture and $549 paid in excess of cash received. Here, the harshness to the lender comes from the nature of the ILA penalty, not so much from its conjunction with the TIL Act penalty.
 The court in Norman offered no explanation for the damages rule it formulated. We do not know why Georgia allows such divergent results in the case of new loans and refinanced loans and in the case of different refinancing situations. But it is clear that the Norman rule in no way assures that TIL Act policies are vindicated; whatever it does aim at, its relation to TIL Act goals is nonexistent.
 
 
 [8]
 Another recent case from this court cautions us against giving too much weight to technical niceties of state contract law in determining how best the TIL Act goals are to be accomplished. In Cody v. Community Loan Corporation of Richmond County, 606 F.2d 499 (5th Cir. 1979), the court was required to decide whether a loan company was a "seller" within the meaning of the TIL Act and thus required to make "credit sale" disclosures when its loan managers also acted as agents for an insurance company in selling insurance policies and the loan company financed payment of the premiums. The loan company argued that under Georgia law there was no "sale" of an insurance policy until the insurer itself accepted the application for the policy. Thus it argued that only the insurer could be a seller of the policy and that the loan company could not be liable for failure to make TIL Act "credit sale" disclosures in connection with the policy
 As one reason for rejecting the loan company's argument, the court stated:
 (U)nder 12 C.F.R. § 226.8(a), a creditor must make TIL disclosures "before the transaction is consummated." Section 226.2(kk) provides that a "transaction shall be considered consummated at the time a contractual relationship is created . . . . " Thus, although state law is determinative of when a contractual relationship is created, it has nothing whatsoever to do with how the transaction is to be characterized for TIL purposes. The obligation to disclose arises before the creation of a contractual relationship, and it would be circular to define the nature of the transaction which determines the particular disclosures that are required in terms of the state law governing the contract's formation. We thus characterize the transaction as a matter of federal law. Starks v. Orleans Motors, Inc., 372 F.Supp. 928, 931 (E.D.La.) (Rubin, J.), Aff'd, 500 F.2d 1182 (5 Cir. 1974).
 606 F.2d at 505.