**Jessie BAILEY and Sandra Bailey, Plaintiffs,**

**v.**

**DEFENBAUGH & CO. OF CLEVELAND, INC., Defendants.**

**No. GC 80–218–WK–O.**

United States District Court,
N. D. Mississippi,
Greenville Division.

April 29, 1981.

L. Paul Kossman and Nancy P. Kossman, Cleveland, Miss., for plaintiffs.

Kenneth G. Stamps, Jackson, Miss., for defendants.

Richard E. Ulmer, Sp. Asst. Atty. Gen., Barry H. Powell, Jackson, Miss., for amicus curiae.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This action was brought by plaintiffs Jessie and Sandra Bailey against defendant Defenbaugh & Co. of Cleveland, Inc. Plaintiffs allege that defendant, a loan company, violated both the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* [hereafter TILA], and corresponding Regulation Z promulgated pursuant thereto by the Federal Reserve Board, 12 C.F.R. § 226.1 *et seq.*; and the Mississippi Small Loan Regulatory Act, Miss.Code Ann. § 75–67–101 *et seq.* [hereafter Mississippi Act], and the regulations promulgated thereunder by the state comptroller of banks. We exercise jurisdiction over the alleged infractions of Mississippi law pendent to our unquestioned TILA jurisdiction. Plaintiffs' allegations under both state and federal law concern defendant's September 25, 1979, loan to them. After full trial to the court, oral argument, and submission of legal memoranda, including *amici* briefs by Central Mississippi Legal Services and the Attorney General of the State of Mississippi, we render judgment for plaintiffs on the Mississippi cause of action but rule that defendant did not violate the federal Truth In Lending Act.

### I. Findings of Fact

On July 5, 1979, the Baileys' 1974 Chevrolet Vega was wrecked in an automobile accident. Because the car was a total loss, the Baileys decided to purchase another automobile rather than replace the Vega's motor and otherwise repair it. The Baileys were about $400 short of the $981 they needed to buy a 1972 motor vehicle they had decided to purchase. On Friday, September 21, Mr. Bailey visited defendant Defenbaugh & Co. of Cleveland, Inc.—the lender who initially had financed the Vega purchase—to borrow the $400. David Hendon, defendant's manager trainee, was on duty as resident loan officer. Bailey testified, and we find as a fact, that during his visit to defendant's office he explained to

Hendon why he needed the $400. We find that Bailey orally communicated to Hendon the condition of the wrecked Vega and therefore its minimal worth, and gave to Hendon an accident report completed by a policeman at the wreck site.[1] Bailey also filled out a loan application at that time. Defendant did not require Bailey to include the value of the 1974 Vega on this application. Instead, defendant relied, as was its practice, on the Baileys' earlier, more comprehensive application—used to obtain the loan to purchase the Vega—for this information.

In addition to Bailey's statements, plaintiffs relied on the testimony of a veteran used-car salesman, whom the court permitted to testify as an expert, to prove the value of the 1974 Vega. This expert asserted, without contradiction, that the wrecked Vega was worth about $25. Comparing Chevrolet's Vega to Ford's Edsel, plaintiffs' expert assessed the value of an operable 1974 Vega with good body at $200 on the wholesale market and no more than $400 on the retail market. We find as a fact that when Bailey applied for a loan on September 21, 1979, the wrecked 1974 Vega was worth no more than $25.

After Bailey had completed the loan application, Hendon telephoned Bailey's employer, Cook's Well Drilling, to verify that Bailey currently worked there as a driller's helper. Hendon then instructed Bailey to return the following week for the money. Bailey stated, and we find as a fact, that at no time did the two men discuss credit life, disability, property, or any other kind of insurance.

On Tuesday, September 25, Bailey, accompanied by his wife, returned to the Defenbaugh loan office to sign papers and pick up the money. The loan papers were ready for signature when the Baileys arrived. The "Disclosure Statement, Promissory Note and Security Agreement" [hereafter Disclosure Statement] contained two lines for signature of borrowers(s). Both Baileys signed it. However, the "Insurance Notice to Loan Applicant" [hereafter Insur-

1. Hendon did not testify at trial.

ance Notice] and the "Insurance Application and Authorization" [hereafter Insurance Application] each included only a single line for borrower's, or loan applicant's, signature. Mr. Bailey alone signed these two documents. Despite their signatures, the Baileys testified without contradiction, and we find as a fact, that Hendon did not discuss insurance with them but merely presented these documents for signature.

The Disclosure Statement specified the terms and conditions of the loan. It listed as borrowers Jessie and Sandra Bailey, and it disclosed that they must make payments of $70 per month for fifteen months, due the 25th of each month, to repay principal plus accrued interest at 35.67% per annum. The Disclosure Statement also contained the following information:

1. Total of Payments . . . . . . . . . . . . . . . . . . . .$1050.00
2. FINANCE CHARGE . . . . . . . . . . . . . . . . . .$ 212.67
3. Amount Financed (Item 1 minus Item 2) . .$ 837.33

The Amount Financed will be disbursed to or for Borrower as follows:

4. Credit life Ins. Premium
   Single ___ Joint _X_ . . . .$22.97
5. Credit Disability Ins. Prem . . .$39.90
6. Property Insurance Premium

   SIA Ins. $66.00

   Sub-Total: $ 708.46

10. Cash to Borrower . . . . . . . . . . . . . . . . . . . .$ 708.46

Schedule of payments: First Payment of $70.00 due on 10/25/79, with 14 additional monthly installments thereafter of $70.00, payable on the same date of each succeeding month, the last payment being due on 15 Months.

Plaintiffs' Exhibit 1. The collateral listed on the Disclosure Statement consisted solely of the 1974 Vega, with no indication of its present condition.

The Insurance Notice informed the Baileys that they were not required to obtain credit life and disability insurance to receive the loan and that they might choose the person through whom property insurance would be obtained. The costs of joint credit life insurance ($22.97) and of credit disability insurance ($39.90) for the life of the loan (15 months) were listed in the Insurance Notice, and the box indicating that the loan applicant desired these coverages "on the first person named in the note" was checked. Mr. Bailey, who is the first-named person in the note, signed this Insurance Notice. The Insurance Application requested single automobile fire, theft, and collision coverage for the 1974 Vega. The form contains no description of the vehicle's condition but insures the Vega for $1000 over the duration of the $1050 loan. The total property insurance premium is listed as $66. Mr. Bailey, the only debtor included on the Insurance Application, signed the form. Hendon signed it over a line labelled "Witness." As usual, defendant received 50% of these insurance premiums as a commission for selling the insurance.

In accordance with its standard practices, defendant subjected the loan papers to its three-tiered oversight procedure. W. R. Defenbaugh, defendant's vice president, testified that the first tier consists of the loan office manager—in this case Hendon—personally taking applications and himself typing them in order to avoid clerical errors. The second tier entails an independent recheck by the loan office's secretary or assistant manager and the entry of the loan information by that person on company books. The third tier lies in the hands of W. R. Defenbaugh, who personally reviews every loan made. Defenbaugh testified that he looks for signatures as well as for possible fraud and in general evaluates the soundness of the loan. Defenbaugh stated that these procedures were in effect when the Baileys applied for and received the loan in question and that his personal approval of all Hendon's loans was necessary during this period because Hendon, as a manager trainee, had been on that job for only five to six days of his thirty-day probationary period. Finally, Defenbaugh explained that he considered the three-tiered system effective to detect mistakes because defendant had no small loan violations in 1977 and 1978 and only one in 1979. Defenbaugh regarded any irregularities in the Baileys' loan as an error on defendant's part despite the existence of the three-tiered oversight system.

Kit Bryant, who worked as defendant's manager until 1978, testified that he had never heard of the three-tiered system. However, during the course of his examination it became apparent that the three-tiered system did exist. Bryant simply had not heard it described in those terms. Bryant did, however, note that borrowers are given their funds before the oversight procedure is completed. If mistakes are discovered, defendant routinely attempts to recall borrowers to its office and make the necessary corrections.

To summarize, we find as facts that defendant maintained a three-tiered oversight system designed to reveal errors in loan transactions. This system generally worked well, but on occasion mistakes remained uncorrected because of unavoidable human error. The Baileys' loan papers were subjected to the review process, but they, like other borrowers, received their money before oversight process was completed.

At the time the parties consummated this loan, the Baileys owed defendant about $300 on the prior loan from defendant they had used to purchase the 1974 Vega. On September 25, when they received the $708.46 cash to borrower, the Baileys paid off the earlier loan and were left with the approximately $400 they needed to buy the replacement automobile. Because the Baileys paid off the first loan early, they became entitled to $42.19 in unearned finance charges and insurance premiums. On October 13, defendant applied this amount to the Baileys' account so that their first payment of $70, due October 25, was reduced to $27.81. The Baileys made payments on their loan for a short time but ceased to do so in early 1980, having paid a total of $210 on the loan. At trial, the balance of their account, including accrued interest, had reached $966.50.

## II. Conclusions of Law

Plaintiffs seek civil penalty of twice the finance charge, plus attorney's fees, under TILA and Regulation Z. *See* 15 U.S.C. § 1640(a). In addition, plaintiffs pray that the court declare void defendant's loan contract with them and order all principal and interest paid refunded to them. Miss.Code Ann. § 75–67–119. Plaintiffs advance several theories of recovery under TILA as well as under the Mississippi Act. We resolve these issues seriatim.

### A. *TILA.*

Plaintiffs contend that defendant violated TILA and Regulation Z in three respects. First, they allege that defendant failed to include premiums for credit life and disability insurance in the finance charge. Second, they claim that the schedule of payments disclosed was unclear, inaccurate, and misleading. Finally, they argue that defendant's failure to disclose independently cost and finance charges for plaintiffs' credit life and disability insurance and also property insurance contravened TILA and Regulation Z.

#### (i) Failure to Include Insurance Premiums in Finance Charge.

Under 15 U.S.C. § 1605(b), premiums for credit life, accident, or health insurance written in connection with a consumer credit transaction must be included in the finance charge unless *inter alia* the borrower gives specific affirmative written indication of his desire to obtain the insurance after written disclosure to him of its cost.[2] See 12 C.F.R. § 226.4(a)(5) (virtually identical provision). It is undisputed that these insurance charges were included in the

---

2. Section 1605(b) states in full:

Charges or premiums for credit life, accident, or health insurance written in connection with any consumer credit transaction shall be included in the finance charge unless

(1) the coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit, and this fact is clearly disclosed in writing to the person applying for or obtaining the extension of credit; and

(2) in order to obtain the insurance in connection with the extension of credit, the person to whom the credit is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof.

amount financed and not in the finance charge. Defendant admits that it failed to procure Mrs. Bailey's signature on the Insurance Notice along with that of Mr. Bailey and thereby violated TILA and Regulation Z. However, defendant asserts that it should not be held liable for this violation because its omission was the result of an unintentional, bona fide error.

The good faith defense defendant seeks to invoke is codified at 15 U.S.C. § 1640(c), which provides:

> A creditor may not be liable . . . if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

It is clear that defendant's failure to obtain Mrs. Bailey's signature on the Insurance Notice was unintentional and bona fide in the sense that defendant did not voluntarily and deliberately omit Mrs. Bailey's signature, and we conclude that Defenbaugh's three-tiered oversight system satisfied § 1640(c)'s requirement for procedures designed to avoid such errors. However, Fifth Circuit law interprets § 1640(c) to apply only to clerical errors, as opposed to errors of law in construing TILA and Regulation Z requirements. *E. g. McGowan v. King, Inc.*, 569 F.2d 845, 849 (5th Cir. 1978). The ability of defendant to successfully invoke the good faith error defense thus hinges on whether defendant's failure to obtain Mrs. Bailey's signature on the Insurance Notice constituted a clerical error or an error of law.

Plaintiffs rely upon *Ray v. Acme Finance Corp.*, 367 So.2d 186 (Miss.1979), in asserting that defendant's error must be characterized as clerical. In *Ray*, plaintiffs cosigned the loan, which did not include the cost of joint accident and health insurance in the finance charge. However, only one cosignor had signed the form disclosing that the creditor did not require health and accident insurance to obtain a loan. Therefore,

the lender had violated TILA as to one cosignor who did not sign the disclosure form. *Id.* at 188. With respect to the lender's bona fide error defense, § 1640(c), the Mississippi Supreme Court held:

> Clerical error is defined in Black's Law Dictionary, page 319 (4th ed., 1968) as: "Generally a mistake in writing or copying." In *Ratner v. Chemical Bank New York Trust Company*, 329 F.Supp. 270 (S.D.N.Y.1971), the court noted that the original version of the senate bill had no exemption for unintentional or bona fide violations but based on objections in hearings that the complex calculations involved would necessarily generate some unintentional mathematical error, the bill was changed. The error here is not a mathematical error, but one of failure to comply with an affirmative requirement of the Act. While such an error may have been inadvertent, it is not the type of clerical error protected by the defense of 15 U.S.C. section 1640(c). To hold otherwise would put an undue burden upon debtors attempting to enforce the requirements of the Act.

*Id.* at 188–89. The *Ray* court accordingly ruled against the lender.[3]

*Ray* would appear to control disposition of the case sub judice because it characterized failure to obtain a comaker's signature on an insurance notice as an error of law rather than as a clerical error. However, decisions of the Mississippi Supreme Court construing TILA, a federal statute, are not binding on us. Although we accord deference to *Ray*, we disagree with its holding on the TILA issue. We conclude, after careful deliberation, that the Mississippi Court drew too fine a distinction in viewing failure to obtain a comaker's signature on the insurance notice as an error of law rather than as a clerical error.

We do not dispute that the Mississippi Court accurately summarized the bona fide error defense's legislative history, which explicitly states that mathematical errors are clerical in nature. However, we do not

---

**3.** Plaintiffs also cite *Clemmer v. Liberty Financial Planning, Inc.*, 467 F.Supp. 272 (W.D.N.C. 1979), which reaches the same result but does not discuss the bona fide error defense.

believe that Congress intended to restrict what should be classified as "clerical" to the single, narrow category of mathematical errors. Several decisions support our interpretation of the bona fide error defense by implying that failure to fill in a blank is clerical, *Turner v. Firestone Tire & Rubber Co.*, 537 F.2d 1296, 1298 (5th Cir. 1976); by stating that the defense concerns "*basically* only clerical errors," *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1167 (7th Cir. 1974) (emphasis added); and by recognizing "that every error of law may also, at least in cases of omission, be construed as a clerical error," *Houston v. Atlanta Federal Savings & Loan Ass'n*, 414 F.Supp. 851, 857 (N.D.Ga.1976). But the most important factor in our consideration is that courts have not inquired whether errors are clerical in a vacuum, with the alternative to "clerical" being simply "not clerical." Courts have asked whether an error is clerical *as opposed to* being an error in interpretation of law. E. g., *McGowan v. King, Inc.*, 569 F.2d 845 (5th Cir. 1978). We conclude that defendant's error in failing to obtain Mrs. Bailey's signature was more in the nature of a clerical error than it was of an error of law. Particularly persuasive to this conclusion is our finding of fact that defendant *knew* it was legally required to obtain Mrs. Bailey's signature on the insurance notice yet failed to do so by human error despite the existence of an efficient oversight system.

This factual finding pierces the Baileys' additional argument that the existence of only one borrower's signature line on the Insurance Notice illustrates defendant's misapprehension of TILA. The lack of another line on the form is of no consequence in finding defendant's error was one of law in light of Mr. Defenbaugh's admission that his company erred. That defendant has violated lending laws so few times is also indicative of a "clerical" error. Presumably, widespread, systematic errors would have resulted in numerous violations of the law. *See Smith v. Chapman*, 436 F.Supp. 58, 65 (W.D.Tex.1977), *aff'd* 614 F.2d 968 (5th Cir. 1980) (because all 374 contracts executed during year contained TILA violations, bona fide error defense inapplicable).

Finally, we do not believe, in contrast to the Mississippi Supreme Court, that our conclusion "would put an undue burden upon debtors attempting to enforce the requirements of the Act." 367 So.2d at 189. The burden on debtors under our holding will be no greater than if only mathematical errors were characterized as clerical. The burden on a debtor in either case would be to show numerous errors, or a pattern of errors, to prove that their commission was not unintentional.

We accordingly hold that defendant's failure to obtain Mrs. Bailey's signature on the Insurance Notice amounted to an unintentional, bona fide error that came about despite the maintenance of procedures reasonably adapted to avoid it, and therefore rule in favor of defendant on this issue.

### (ii) Inaccurate Schedule of Payments.

■ Both TILA, 15 U.S.C. § 1639(a)(6), and Regulation Z, 12 C.F.R. § 226.8(b)(3), require a creditor to disclose "[t]he number, amount, and the due dates or periods of payments scheduled to repay the indebtedness." The Disclosure Statement scheduled the Baileys to repay defendant by making 15 monthly payments of $70, each due on the 25th of the month with the first being due October 25, 1979. The Baileys contend that defendant violated TILA and Regulation Z when on October 13 it applied the refund from the Baileys' prior loan to the October 25 payment. According to the Baileys, defendant knew how much the refund amount would be and must have intended to use it as partial payment on the new loan, so failure to disclose this payment as a scheduled payment on the Disclosure Statement violated TILA and Regulation Z.

We disagree with the Baileys' position on two grounds. First, both statute and regulation speak of "scheduled" payments. "Scheduled" payment, to us, means the amount of money a borrower must remit per unit of time to repay the loan according to its terms and in a timely fashion. The $42.19 refund credited to the Baileys'

account was not, under this definition, a scheduled payment. The Baileys' obligation was to pay $70 by October 25. That they paid a portion of the $70 in advance changed neither their obligation nor the schedule of payments.

Our second ground of disagreement with the Baileys' position rests on the fact that to characterize the $42.19 payment as unscheduled does not obstruct the purpose for which Congress enacted TILA. In 15 U.S.C. § 1601, Congress stated its intent: "It is the purpose of [TILA] to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." Whether the $42.19 was listed as a scheduled payment was immaterial to the Baileys' choice of lender because the money was refunded when the Baileys paid off their first loan early. The realization of the $42.19 thus constituted a transaction distinct from the second loan. No matter from whom the Baileys procured their second loan, they could have used part of the proceeds from it to pay off the first loan and thereby received their refund of $42.19. It is apparent, then, that whether the $42.19 payment was scheduled could not have had any bearing on the Baileys' comparative assessment of various lenders' credit terms. The Baileys adduced no evidence at trial to show that they received a greater refund by borrowing from defendant than they would have received had they borrowed from another source. For these reasons we rule in favor of defendant on this alleged violation of TILA and Regulation Z.

(iii) Failure to Disclose Finance Charges On Insurance Policies.

■ The final violation of federal law asserted by plaintiffs relies on TILA and Regulation Z to show that the sale of the insurance policies to plaintiffs was a credit sale of insurance. *See* 15 U.S.C. § 1602; 12 C.F.R. § 226.2. Under 15 U.S.C. § 1638(a) and 12 C.F.R. § 226.8(c), the cash price of items purchased and the finance charge for the amount borrowed must be disclosed in a

credit sale. Because defendant included the insurance premiums in the Disclosure Statement as part of the amount financed rather than as part of the finance charge, plaintiffs contend defendant violated TILA and Regulation Z. Plaintiffs claim that by placing these charges in the amount financed category rather than independently disclosing both the cost and the interest on the policies, defendants prevented plaintiffs from knowing how much it was costing them in finance charges to purchase these policies of insurance.

In support of their argument plaintiffs cite *Cody v. Community Loan Corp. of Richmond County*, 606 F.2d 499 (5th Cir. 1979), *cert. denied*, 446 U.S. 988, 100 S.Ct. 2973, 64 L.Ed.2d 846 (1980). In *Cody*, plaintiffs bought cancer insurance policies through defendant loan company at the same time they borrowed money from it. "This insurance was to be issued by American Family Life Assurance Company and was to be offered in addition to the credit life, accident and health, and property insurance customarily written in connection with loan transactions." *Id.* at 501. Payment for the insurance was not included in the finance charge or in the amount financed. Instead, it was subtracted from net money paid to the borrower. Characterizing the sale of cancer insurance as a credit sale, the Fifth Circuit ruled that defendant had failed to make the disclosures required by 15 U.S.C. § 1638(a) and 12 C.F.R. § 226.8(c): "The only finance charge shown is that for the entire amount of the loan, and the consumer is thus unable to determine exactly what he is paying for the credit to enable him to purchase the insurance policy." *Id.* at 507.

We disagree with plaintiffs' contention that *Cody* should be extended to encompass the case sub judice. Plaintiffs' argument fails to take account of 15 U.S.C. § 1605(b) and 12 C.F.R. § 226.4(a)(5)–(6), which require that except under circumstances not material to this issue, premiums for insurance written in connection with consumer credit transactions must be included in the finance charge. *Cody* is distinct because the cancer insurance was not insurance sold

"in connection with" a consumer credit transaction. In the case before us, the sale of insurance was made "in connection with" the loan transaction and does not, therefore, amount to an independent and distinct credit sale. *Cody* recognized the qualitative difference between credit life, accident and health, and property insurance and the independent sale of cancer insurance when it stated that cancer insurance was sold "in addition to" the types of insurance "customarily written in connection with loan transactions." *Id.* at 501.

Moreover, the Federal Reserve Board has expressly stated that credit sales disclosures are not required when these types of insurance are obtained from or through the creditor in connection with a loan:

> Where these types of insurance are written in connection with a credit transaction, and the creditor properly excludes the insurance charges from the finance charge for that transaction and finances the purchase of the insurance as part of the transaction, the amount of the insurance charges should be disclosed as a charge included in the "amount financed." It is not necessary to provide a separate set of credit sale disclosures for the insurance premiums.

FRB Official Staff Interpretation, No. FC–0167 (Aug. 8, 1979), *reprinted in* 44 Fed. Reg. 50326. We therefore hold that the sale of credit life and disability and property insurance to plaintiffs was made in connection with their loan and was therefore not subject to the disclosure requirements that attach to credit sales under TILA and Regulation Z. The insurance premiums having been properly included in the amount financed, we rule against plaintiffs on this issue.

### B. Mississippi Act.

Plaintiffs allege that defendant violated the Mississippi Act, Miss.Code Ann. § 75–67–101 *et seq.*, and regulations promulgated pursuant thereto, in three respects. First, they contend that defendant overinsured their collateral and thereby overcharged them for the insurance premium. Second, they urge that defendant received commissions on these insurance sales, thus charging plaintiffs more than the policies' actual cost. Finally, plaintiffs argue that Hendon was not a licensed insurance agent at the time of the loan transaction.

### (i) Private Right of Action.

■ As a preliminary matter, we address whether the Mississippi Act creates a private right of action. Defendant argues that it does not. As proof of legislative intent that only the State of Mississippi may enforce the Act's provisions, defendant cites § 75–67–107: "The provisions of [the Mississippi Act] shall be enforced and administered by the state comptroller of banks and his duly authorized agents, representatives and employees." However, § 75–67–111 specifies that "[a]ny suit brought against a licensee *by any person* on account of the violation or alleged violation of any of the provisions of [the Mississippi Act] with reference to any loan transaction shall be brought within twenty-four (24) months after the final maturity date of the loan, and not thereafter." (emphasis added). There seems little point in enacting a statute of limitations governing suit "by any person" if the Mississippi Legislature meant only the state comptroller of banks to be able to sue. Thus, the statute contemplates enforcement not only by the state comptroller of banks but also by private citizens. Any doubt on this score has been resolved by *Consumers Credit Corp. v. Stanford*, 194 So.2d 868 (Miss.1967). In *Stanford*, lender sued borrower to recover the balance due on a note. Defendants claimed that plaintiff failed to furnish them a statement showing the amount and date of the loan and to issue receipts for payments made. Not only were plaintiffs permitted to raise the Mississippi Act as an "affirmative defense" but to void the debt and keep the money when they prevailed. 194 So.2d at 874 (dissenting opinion). In effect, the Mississippi Supreme Court in *Stanford* endorsed the position that the Mississippi Act affords private plaintiffs a right of action. Following *Stanford*, we conclude that a private right of action exists under the Mississippi Act.

Defendant's only substantial response to plaintiffs' position is found in the latest regulations promulgated pursuant to the Mississippi Act. These regulations became effective April 1, 1981. Section 1, entitled "Scope of Regulations," states in part that "[t]hese Regulations are not intended to create any private right, remedy, or cause of action in favor of any borrower or against any licensee." To place the meaning of this quotation in context, it is necessary to read Section 1 in its entirety:

These regulations are promulgated pursuant to the Small Loan Regulatory Act of 1958 (Mississippi Code of 1972, § 75–67–101, et seq.) and the Small Loan Privilege Tax Act of 1958 (Mississippi Code of 1972, § 75–67–201, et seq.) to establish administrative procedures required by the Department of Banking and Consumer Finance. These Regulations shall be applicable to licensees under the Small Loan Privilege Tax Act and to transactions covered by the Small Loan Regulatory Act. These Regulations are not intended to create any private right, remedy, or cause of action in favor of any borrower or against any licensee, nor are the Regulations intended to apply to any business transaction of a licensee not covered by the Acts. While these regulations are intended to and do supersede all prior regulations of the Department of Banking and Consumer Finance, these Regulations are intended only to clarify the existing law (both statutory and regulatory) governing the small loan business. In this connection, these Regulations do not create any new or substantive rights in favor of any borrower or against any licensee, regardless of whether the loan was made prior to or after the effective date of these Regulations.

It is apparent that the purpose of the regulations is to clarify current law, not alter it. A private right of action having been established in *Stanford*, the regulations by their expressed intent do not abolish it. Moreover, the regulations would be invalid if they did purport to change the substantive law, for "[s]ubstantive law is not to be thwarted by administrative rules adopted for implementation of the legislative intent." *Buse v. Mississippi Employment Security Commission*, 377 So.2d 600, 602 (Miss. 1979). We hold that pursuant to the Mississippi Act and interpretive state law, a private right of action exists in favor of plaintiffs to recover for violations of the Act.

(ii) Excessive Charge Through Overinsurance.

Under Miss.Code Ann. § 75–67–121, a licensed moneylender may charge borrowers only the actual cost of property insurance. Regulation VI(A)(2), promulgated by the state comptroller of banks pursuant to Miss.Code Ann. § 75–67–129, expands on this limitation:

Insurance on Property Securing Loan—Property Insurance may be written in connection with any loan subject to the terms and conditions as follows:

. . . . .

2. The fire, theft, extended coverage and inland marine insurance shall be written for the total of payments or for the value of the property, whichever is less.

Because we have found as a fact that the maximum value of the 1974 Vega was $25 in its wrecked condition, it would appear that defendant has violated both Act and regulation by charging plaintiffs for $1000 of property insurance on the Vega in making the second loan.

Defendant responds that the Baileys, not it, should be held accountable for the excessive property insurance charge. Defendant argues that Mr. Bailey's signature on the Insurance Application constituted a representation that the Vega was worth the $1000 liability limit noted on the face of the application. In support, defendant cites *Anthony v. Community Loan & Investment Corp.*, 559 F.2d 1363 (5th Cir. 1977), in which the Fifth Circuit held that for purposes of TILA and Regulation Z, the borrower's signature indicating she desired insurance coverage estopped her from denying that she requested or desired it. However, this holding does not bind us because we construe Mississippi, not federal law. In

any event, we consider *Anthony* dissimilar from the case sub judice. In *Anthony*, plaintiff contended that defendant loan company had given her the impression that credit life and disability insurance were required to obtain the loan when in fact they were not. Therefore, the nature of the parties' obligations was at issue. In contrast, the Baileys were obliged to obtain property insurance on their loan. Having decided to insure the Vega through defendant, the only remaining question was merely for how much.

Our findings of fact reveal that Hendon never discussed insurance with the Baileys, yet the Baileys necessarily disclosed the condition of the wrecked 1974 Vega when they applied through Hendon for a loan to replace the vehicle. The proof also showed that defendant must have consulted its initial loan application from the Baileys to determine the Vega's current worth. This application showed the Vega to be in good condition, so defendant mistakenly concluded that the value of the Vega remained in excess of $1000. The Baileys should not be brought to task for defendant's failure to listen to them and to correct its records accordingly.[4]

Although Mr. Bailey's signature appears on the Insurance Application, we do not construe his signature as a representation that the Vega was worth at least $1000, for to do so would conflict with the Mississippi Act's remedial purposes expressed in Miss. Code Ann. § 75–67–101. The Baileys, unsophisticated consumers, thought that they had imparted to defendant all the information it needed to prepare the loan papers. Had Hendon paid attention, he would have deduced that the property to be used for collateral was worth no more than $25. Hendon had the opportunity to inquire further but did not take advantage of it. Mr. Bailey's signature on the Insurance Application, in this context, must be viewed as merely a formality rather than as a representation of value.

We note with approval *Holton v. Tower Loan of Mississippi, Inc.*, No. 23–097 (Ch. Ct. Madison Cty. Miss. Nov. 5, 1977). On facts similar to those here, the court stated:

> Under Section 75–67–121 the licensee may charge only for the actual cost of any premium paid for property insurance. Clearly, the implication of this statute is that such premiums must be those reasonably required. For the licensee to charge a premium for approximately three times more coverage than was required is unreasonable and results in borrower paying more than the actual cost of necessary insurance. If the property had been totally destroyed recovery would have been limited to the value of the property. Any premium charged in excess of that required to cover actual value would be greater than "actual cost."

*Id.* at 6–7. For the reasons expressed in *Holton* and for the other reasons noted above, we rule in favor of plaintiffs on this issue.

### (iii) Insurance Commissions as Excessive Charges.

■ Plaintiffs' second argument under the Mississippi Act is that defendant illegally billed them an excessive insurance charge by receiving commissions on the insurance sales. Plaintiffs rely on Miss.Code Ann. § 75–67–121, which permits a licensee to charge borrowers the "actual cost of any premium paid" for property, credit life or credit disability insurance. Plaintiffs thus construe "actual cost" to mean the cost of insurance to the licensee exclusive of whatever profit the licensee realizes from sale of insurance policies.

Plaintiffs rely wholly on *Holton, supra*:

> Independently of the reasons heretofore assigned for supporting the conclusion that the defendant made excessive charges in regard to property insurance, life insurance and cancer insurance, another cause exists for concluding that ex-

---

**4.** Regulation 7(a) of the new regulations, *see* part B(i), *supra*, states in part that "[t]he licensee may rely on borrower's representation of

the value of the property." It is apparent that Hendon failed to heed the representations of value made to him by Mr. Bailey.

cessive charges were made by the defendant. Mr. Halford testified that the defendant encouraged its representatives to sell insurance and that insurance premiums represented money to the defendant. The conclusion to be drawn is that the defendant makes a commission of some type on insurance it writes in connection with its loans. This being so, the defendant is in substance charging more than the actual cost of such insurance and such is prohibited by Section 75–67–121. It seems clear from this statute that while the legislature was willing to permit a licensee to protect its loans by requiring certain types of insurance, it nevertheless did not want the licensee to otherwise profit from the purchase of such insurance.

*Id.* at 10. Defendant responds only by arguing that *Holton* is inapposite because *Holton* assumed that the insurance commission was being paid to the licensee, whereas in the instant case, the commission is paid not to defendant but to Mr. Defenbaugh. But the proof belies defendant's position. In the pretrial order, the parties stipulated that "[a] portion of the premiums for the sale of the insurance policies described above was rebated to Defendant as an insurance sales commission." Defendant's ground of distinction is unfounded in the facts.

As an alternative ground for our decision, we find *Holton*'s reasoning persuasive. We believe that the Mississippi Legislature must have meant by "actual cost" the cost to the licensee, or it would have used a different phrase, such as "actual cost including a reasonable commission." The legislature has already permitted lenders to make a handsome profit by allowing them to charge borrowers interest of up to 36% per annum. Further compensation in the form of commissions for insurance sales seems unwarranted, especially because the purpose of credit life, disability, and property insurance is to protect the lender, not the borrower, by insuring that a loan will be repaid despite destruction of collateral or impairment of the borrower's earning ability. We therefore hold that defendant charged plaintiffs more than the "actual cost" of insurance premiums and accordingly rule in plaintiffs' favor on this issue.

(iv) Sale of Insurance by Unlicensed Agent.

■ Plaintiffs' final allegation that defendant violated the Mississippi Act involves whether defendant sold them the insurance policies through a licensed insurance agent, required by Regulation VI. The proof showed that Hendon was not in fact a licensed insurance agent, but Mr. Defenbaugh possessed a license individually. Defendant argues that Defenbaugh, not Hendon, sold the insurance to plaintiffs and accordingly that no violation of the Mississippi Act transpired.

The evidence shows, as we found, that Hendon, not Defenbaugh, dealt with the Baileys. Moreover, Hendon's signature appears on the Insurance Application. These facts lead us to conclude that Hendon, not Defenbaugh, sold the insurance policies to the Baileys.

Assuming that Defenbaugh rather than Hendon sold the policies, our conclusion would be the same. Miss.Code Ann. § 83–17–101 defines "agent" to include "all individuals ... who act in any manner, directly or indirectly, as such in the solicitation of, negotiation for, or procurement or making of a contract of life, health or accident insurance." Closer inspection of Regulation VI reveals that not only the writing but the solicitation of credit life or health and accident insurance is forbidden to anyone except licensed insurance agents. Hendon's actions in securing insurance for the Baileys amounts at the very least to solicitation of insurance. Therefore, Hendon must be statutorily deemed to be an insurance agent, and he admittedly was not so licensed. On this alternative issue we also rule in plaintiffs' favor.

(v) Remedy.

■ Central to determining what remedy exists for violation of the Mississippi Act is Miss.Code Ann. § 75–67–119:

If any charges in excess of those expressly permitted by [the Mississippi Act] are charged, contracted for or received, except as the result of an accidental or bona fide error, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest, or charges whatsoever . . . .

Plaintiffs contend that § 75–67–119 must be read in conjunction with § 75–67–121, which permits a lender to charge the actual cost of premiums paid for credit life, health, and accident insurance and property insurance. Because we have concluded that defendant charged plaintiffs in excess of actual cost of these types of insurance by over-insuring the collateral and by receiving commissions thereon,[5] plaintiffs would have us void the contract and order defendant to reimburse plaintiffs all sums to date paid defendant pursuant to the loan.

Defendants argue that § 75–67–119 has been repealed by implication. The title of § 75–67–119, "Charging of unlawful service charges and interest; penalty for," refers in defendants' view to § 75–67–117, which regulated the amount of service charges and interest a lender might assess the borrower. The Mississippi Legislature repealed § 75–67–117 in 1974. Construing § 75–67–119 as a companion statute to § 75–67–117, defendant argues that § 75–67–119 is nugatory because no violations can come about to be enforced.

Defendant argues that the penalty for violation lies instead in § 75–17–1(9). This section provides for forfeiture of interest and finance charges if an impermissibly large finance charge is assessed. If the finance charge is more than double the allowable amount, interest, finance charges, and principal are forfeited as a civil penalty for violation. But § 75–17–1(9) expressly excludes insurance premiums from its defi-

nition of finance charge, so the provision has no application here.

In our view, plaintiffs' reading of the Mississippi Act is correct. That the Mississippi Legislature repealed § 75–67–117 but left intact § 75–67–119 clearly implies that § 75–67–119 retains efficacy. The title of § 75–67–119, referring to "service charges," fails to convince us that the section's penalties were aimed only at § 75–67–117. In conjunction with § 75–67–121, § 75–67–119 takes on the meaning that plaintiffs ascribe to it. We hold that the remedy for charging borrowers greater than the actual cost of insurance premiums under §§ 75–67–119 & –121 is the invalidation of the loan contract and the refunding to the borrower all payments of any nature made under its terms.

### III. Conclusion

In this action by borrowers against a loan company, brought under TILA and Mississippi law, we have ruled in defendant's favor on all federal law issues. However, we have concluded that a private right of action exists under the Mississippi Act and that plaintiffs prevail on all state law issues raised. As remedy for these violations, we have held that charging more than the actual cost of insurance by overinsuring the collateral and by receiving commissions on insurance sales requires us to void the loan contract. Furthermore, defendant must refund to plaintiffs all monies, including principal, interest, and other charges, paid by plaintiffs to defendant pursuant to the void contract. We have withheld ruling on what remedy, in addition to possible revocation of license by the state, may lie for selling insurance without license to do so.

Let judgment issue accordingly.

---

**5.** This remedy does not attach to defendant's third violation of the Mississippi Act, selling insurance without license to do so. This violation draws its source from the Regulations, not the Act. The remedy for violation of regulations is contained in Regulation XXIV, which states in full: "Any willful violations of the above regulations will be considered as grounds for possible revocation of license." Perhaps remedies other than that promulgated in Regulation XXIV exist. We do not reach this issue because our disposition of the question of proper remedy for the other two Mississippi Act violations affords plaintiffs complete relief.